# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

TRAVIS RIDDLE,

    Plaintiff,

    v.

HERITAGE PROPERTY & CASUALTY
INSURANCE COMPANY,

    Defendant.

2:23-CV-06

## ORDER

Before the Court is Defendant Heritage Property & Casualty Insurance Company's ("Heritage") motion for summary judgment, dkt. no. 25, as well as Defendant Heritage's motion to strike Plaintiff Travis Riddle's supplemental brief, dkt. no. 38. The parties have fully briefed the motions, dkt. nos. 25, 34, 35, 37, 38, and participated in oral argument before the Court, dkt. no. 36. Thus, the motions are ripe for review. For the reasons stated below, Defendant Heritage's motion for summary judgment is **GRANTED** and its motion to strike is **DENIED as moot**.

## BACKGROUND

Plaintiff Travis Riddle owned a house in Atlanta, Georgia, which Defendant Heritage insured (the "Atlanta house"). Dkt. No. 1-1. In 2021, Plaintiff claimed that the house was vandalized and certain property had been stolen. Dkt. Nos. 25-1 ¶ 1, 34-2 ¶ 1.

This case arises from Heritage's denial of an insurance claim filed by Plaintiff regarding this incident. Dkt. No. 1-1. Heritage argues that summary judgment is appropriate because the undisputed facts show that Plaintiff made material misrepresentations, thereby breaching the insurance contract. Dkt. No. 25 at 2-3.

Plaintiff hails from Brunswick, Georgia. Dkt. No. 25-4 at 16:1-2. He began his career as a carpet cleaner. Id. at 17:7-9. Thereafter, according to Plaintiff, he wrote a song under the stage name "Mr. Slim Riddle." Id. at 17:9-12. The song "went crazy." Id. Plaintiff claims he was featured on MTV and BET, and even received a record deal with Universal Studios. Id. at 17:14-18. Plaintiff says that he has starred in three movies produced by Amazon Prime. Id. at 17:23-24. Plaintiff also appeared on *Judge Judy*, where he "got third best case." Id. at 19:3-4. In Plaintiff's own words, he "led [the] protest that got nationwide exposure" for the death of Ahmaud Arbery. Id. at 20:12-19. He also created a music video that he claims received over 200,000 views online in one day alone and that President Joe Biden and basketball star LeBron James shared the video on social media. Id. at 20:12-19, 29:13-15. Aside from these endeavors, Plaintiff says he ran a food truck, worked as a carpenter, and operated a restaurant in Brunswick, Georgia. Id. at 21-26. As a result of his many ventures, Plaintiff says that he achieved financial success. Id. at 81:22-23. As Plaintiff said: "I'm not really hurting for no money. Like, I got money." Id.

Notably, Plaintiff also makes a living from real estate investments. Id. at 21:10–15. In 2021, he allegedly owned three houses in Brunswick, Georgia, and "other properties" in Dixville, Georgia. Id. at 31:14–20. In terms of his own living situation, Plaintiff rented an apartment in Brunswick,[1] lived at his mother's house and aunt's house in Brunswick, and lived with his girlfriend at her condominium in Atlanta. Id. at 37:14–22, 74:1–6. He also occasionally slept at his Atlanta house in the basement. Id. at 63:14–19. Over the years, Plaintiff has filed multiple insurance claims for his investment properties, apartments, and personal property. Id. at 39–46.

In 2007, Plaintiff purchased the house at issue in this case as an investment. Dkt. No. 25-8 at 1. Until 2021, he used the Atlanta house as a rental property. Dkt. Nos. 25-1 ¶ 13, 34-2 ¶ 13. In 2021, a cousin of one tenant allegedly killed another tenant in the front yard of the house. Id. at 69:5–11. Despite this, Plaintiff decided to make that house his permanent residence. Id. at 68:16–18. In February 2021, Plaintiff says that his then-girlfriend, Nia Avery—who did not live in the house or share ownership of it—filed to evict the remaining tenants living at the property. Dkt. No. 25-4 at 67:6–25, 68:1–9. These tenants vacated the home by the end of February 2021. Id. at 73:17–22.

---

[1] Plaintiff later testified that he had actually bought this apartment. Dkt. No. 25-5 at 68:1–6.

On March 9, 2021, Plaintiff applied for a homeowners insurance policy with Heritage. Dkt. No. 25-8 at 1. On the application, Plaintiff stated that he resided at the house. Id. Heritage approved Plaintiff's application that same day, and the policy went into effect immediately. Dkt. No. 7-4. The insurance policy covered the "residence premises," personal property, loss of use, and personal liability. Id. at 4, 8.

After Plaintiff obtained the policy with Heritage, he hired contractors to renovate the house. Dkt. No. 25-4 at 47:12-25, 48:1-14. Then, on May 14, 2021, Heritage notified Plaintiff that it was canceling his insurance policy effective June 12, 2021. Dkt. No. 25-9. Heritage cited multiple reasons for its cancelation, including excessive debris on the property, excessive liability exposure because of the renovations, and the house being a "vacant/unoccupied dwelling."[2] Id. at 2.

Much activity occurred within the short time frame between notification of cancellation of insurance and the cancellation date. On May 25, 2021, Plaintiff fired the contractor performing the renovations. Dkt. No. 25-4 at 74:16-23. The same day, Plaintiff

---

[2] In support of its contention that Plaintiff's Atlanta house was vacant or unoccupied, Heritage cites power and water utility bills that allegedly show no power or water usage at the property from March 2021 to May 2021. Dkt. No. 25-1 ¶ 19. These bills, however, do not exist in the record. Plaintiff admitted during his deposition that the water bills show no usage during these months. Dkt. No. 25-5 at 90:16-25, 91:1-3. He made no such admission as to the power bills. Id. at 93:18-25, 94:1-25, 95:1-13.

directed Avery to conduct a video walk-through of the house to document its present state. Dkt. No. 25-4 at 57:19–20, 79:5–17; Dkt. No. 25-7 ¶ 22. Plaintiff asserts that the house was vandalized just hours after the video was made. Dkt. No. 25-4 at 57:19–21, 75:10–23. Avery discovered the vandalism on May 26, 2021. Dkt. No. 25-4 at 57:19–21, 75:10–23. She made another video walk-through showing the damage. Dkt. No. 25-2 at 21:18–25; Dkt. No. 25-4 at 75:10–25, 76:15–18. No videos were entered into the record in this case. When questioned, Plaintiff did not remember where he was during the vandalism incident, but he knew he "wasn't in Atlanta because if [he] had been in Atlanta [he] would have been in prison for real." Dkt. No. 25-4 at 76:5–8.

When Avery discovered the vandalism, she contacted the South Fulton Police Department. Dkt. No. 25-11. During their investigation, the police found: "damage[] to multiple walls throughout the home, a window in the living room appeared to be broken, and there was tile broken on the floor in the basement." Id. at 3. Avery did not report any stolen property, and the May 26, 2021 report itself did not identify stolen property of any kind. Id. That same day, Plaintiff submitted a claim to Heritage. Dkt. No. 25-12. He claimed that the vandal "put holes in the walls," destroyed electrical outlets and handrails, broke a shower door, broke a window, damaged a ceiling fan, and removed a stove. Id. at 1. He also said that he was "unsure if any items were

taken." Id. Almost two months later, on July 19, 2021, Plaintiff, himself, sought to update the police report. Dkt. No. 25-13. In the updated version, Plaintiff sent the police a list of stolen property. Id. Plaintiff's list mentioned—for the first time—two Samsung televisions which Plaintiff identified as measuring over seven feet (eighty-five inches) each. Id. at 7.

Meanwhile, back in Brunswick, on August 16, 2021, Plaintiff filed a notice of candidacy to run for the office of Mayor of Brunswick. Dkt. No. 25-6. The notice is a sworn election document. Id. In the election document, Plaintiff swore that he had resided at a Brunswick address, had a Brunswick post office address, and owned a Brunswick business named "Country Boy Cooking." Id. at 1. Plaintiff also swore that he had been a legal resident of Glynn County, Georgia, for one-and-one-half years. Id. According to Plaintiff's sworn election statement, then, he had resided in Brunswick, Georgia, from approximately February of 2020 until August of 2021. Ultimately, Plaintiff lost his bid for mayor.[3] Id. at 67:10–13.

Heritage investigated Plaintiff's insurance claim. Dkt. No. 25-14. On December 2, 2021, Heritage examined Plaintiff under oath and requested that he produce documents and evidence to support his claim. Id.; Dkt. No. 25-4. During Plaintiff's examination under

---

[3] He received 101 votes. GLYNN CNTY. BD. OF ELECTIONS & REGISTRATION, ELECTION SUMMARY REPORT (2021).

oath, he made multiple new damage claims for the first time. Dkt. No. 25-4 at 85:8–23. Specifically, he claimed that the vandals knocked over a refrigerator, which caused extensive flooding. Id. As Plaintiff said, "the water was just running, the water was just flowing, flowing, flowing, flowing." Id. at 85:10–12. According to Plaintiff, the flooding caused major damage to the main floor and basement of the house. Id. The police report does not mention flooding or a knocked-over refrigerator. Dkt. No. 25-11. Avery, who discovered and reported the vandalism, confirmed there was no "refrigerator that was tipped over or leaking water." Dkt. No. 25-7 ¶ 25.

Heritage also questioned Plaintiff about the two giant televisions that he claimed were stolen. Dkt. No. 25-4 at 138–39. Plaintiff provided sworn details about the exact location of the televisions for which he sought insurance payment. Plaintiff swore under oath that "[t]here was one [television] over the fireplace and one [television] in the master bedroom." Id. at 139:6–7. He also swore that he owned the televisions and that they had been gifts from Avery. Id. at 140:9–14.

On February 7, 2022, Plaintiff submitted a Sworn Statement in Proof of Loss ("SSPOL") as part of Heritage's investigation. Dkt. No. 7-3. In the SSPOL, Plaintiff identified building damages of $125,609, personal property damages of $19,900, and loss-of-use

damages of $15,200.[4] Id. The amount claimed by Plaintiff in the SSPOL included the loss of the two giant televisions. Dkt. No. 25-5 at 33:1-25, 34:1-3.

Heritage found Plaintiff's claimed damages in the SSPOL to be suspicious. Dkt. No. 7-1. Aside from the tally of personal property damages, Plaintiff claimed significant living expenses (i.e. loss-of-use damages), insisting that he lived in hotels between May 26, 2021, and December 2, 2021. Dkt. No. 25-4 at 172:5-25, 173:1-20. He did not provide proof of these expenses to Heritage, dkt. no. 7-1, and no evidence of Plaintiff's living expenses exists in the record.

On June 7, 2021, Heritage denied Plaintiff's claim. Id. Heritage gave two reasons for its denial. Id. at 4-5. First, Heritage concluded that Plaintiff breached the insurance policy's "Concealment or Fraud" provision. Id. This provision states that "[Heritage] provide[s] coverage to no 'insureds' under this policy if, whether before or after a loss, an 'insured' has": (1) "[i]ntentionally concealed or misrepresented any material fact or circumstance"; (2) "[e]ngaged in fraudulent conduct"; or (3) "[m]ade false statements." Dkt. No. 7-4 at 23. This provision applies only to statements made "relating to this insurance." Id.

---

[4] These amounts, when added together, total $160,709. On the SSPOL, however, Plaintiff claims "total loss and damage" in the amount of $158,009. The Court considers this discrepancy to be immaterial to resolution of the present motion.

The contract also includes a separate fraud provision, which states: "Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison." Id. at 47. Heritage determined that Plaintiff lied about his residency at the Atlanta house, his stolen personal property, and his additional living expenses. Dkt. No. 7-1 at 4.

Second, Heritage denied Plaintiff's claim because it concluded the Atlanta house had been vacant for more than sixty days preceding the vandalism incident. Id. at 5. Heritage explained in its denial letter that Plaintiff's policy did not afford coverage for vandalism if the property was vacant or unoccupied for "more than 60 consecutive days immediately before the loss." Id. For these reasons, Heritage denied Plaintiff's claim in its entirety. Id.

After Heritage denied Plaintiff's claim, he filed this action. Dkt. No. 1-1. Plaintiff claims that Heritage breached the insurance policy by declining coverage and that Heritage acted in bad faith, entitling him to damages pursuant to O.C.G.A. § 33-4-6. Id.

After Plaintiff filed this case, Heritage again had the opportunity to question him under oath. Dkt. No. 25-5. When Heritage deposed Plaintiff in 2023, he was working as a restaurant

manager in Maryland and renting a house there. Dkt. No. 25-5 at 12:15-24. The status of Plaintiff's investment real estate portfolio was unclear at that time. Plaintiff did claim, however, that he had recently started multiple food catering companies, acquired new rental properties, and founded a trucking company called "MSR" in Brunswick. Id. at 61-62.

Notably, during Plaintiff's deposition, his previous sworn testimony about the giant stolen televisions unraveled. Plaintiff admitted that the televisions belonged to Avery and that he had never seen the televisions in the Atlanta house. Id. at 30:12-25, 44:20-25, 45:1-2, 48:18-25. At one point, Plaintiff claimed that "when [Avery] filed the police report [she said] that those TVs were missing out of the home." Id. at 30:14-15. Plaintiff testified that "it was told to [him] in the police report they were no longer there." Id. at 31:17-19. Importantly, the police reports were located and reveal that Avery never submitted a report of missing property. Dkt. No. 25-11. Indeed, no report or evidence was ever submitted showing that anyone reported missing property until two months after the vandalism, when *Plaintiff* added a report that two televisions had been stolen. Dkt. No. 25-13. Avery testified that her televisions were never at Plaintiff's house, were not stolen from Plaintiff's property, and she did not report them as stolen. Dkt. No. 25-7 ¶¶ 27-31.

10

Heritage now moves for summary judgment on Plaintiff's claims. Dkt. No. 25. The Court heard oral argument on this motion on June 6, 2024. Dkt. No. 36. At the hearing, Plaintiff's attorney adhered to this second version of the story Plaintiff provided, the version in Plaintiff's deposition: Plaintiff never saw the televisions but had been informed that they were stolen. Plaintiff's counsel also admitted in full candor that he could not explain how Plaintiff arrived at his $15,200 loss-of-use damages and that no evidence in the record supported that amount.

## LEGAL AUTHORITY

The Court should grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of those material facts "is 'genuine' . . . if the evidence is such that a reasonable

11

jury could return a verdict for the nonmoving party." Id. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" for a jury to return a verdict for the nonmoving party. Id. at 252. Additionally, the party opposing summary judgment "may not rest upon the mere allegations or denials in [her] pleadings. Rather, [her] responses . . . must set forth specific facts showing that there is a genuine issue for trial." Walker v. Darby, 911 F.2d 1573, 1576-77 (11th Cir. 1990).

The Court views the record evidence "in the light most favorable to the [nonmovant]," Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and will draw all justifiable inferences in the nonmovant's favor, Anderson, 477 U.S. at 255.

**DISCUSSION**

**I.   Interpreting Insurance Contracts Under Georgia Law**

Under Georgia law,

> [i]t is well settled that insurance policies, even when ambiguous, are to be construed by the court, and no jury question is presented unless an ambiguity remains after application of the applicable rules of contract construction. Because insurance policies are contracts of adhesion, drawn by the legal draftsman of the insurer, they are to be construed as reasonably understood by an insured.

First Fin. Ins. v. Am. Sandblasting Co., 477 S.E.2d 390, 391-92 (Ga. Ct. App. 1996) (citation omitted). "The policy should be read

12

as a layman would read it and not as it might be analyzed by an insurance expert or an attorney." Cincinnati Ins. Co. v. Davis, 265 S.E.2d 102, 105 (Ga. Ct. App. 1980). "The test is not what the insurer intended its words to mean, but what a reasonable person in the position of the insured would understand them to mean." U.S. Fire Ins. Co. v. Cap. Ford Truck Sales, 355 S.E.2d 428, 429 (Ga. 1987) (internal quotation marks and citation omitted).

"If a provision of an insurance contract is susceptible of two or more constructions, even when the multiple constructions are all logical and reasonable, it is ambiguous, and the statutory rules of contract construction will be applied." Lee v. Mercury Ins. Co. of Ga., 808 S.E.2d 116, 123 (Ga. Ct. App. 2017) (internal quotation marks omitted) (alterations adopted) (quoting Am. Strategic Ins. v. Helm, 759 S.E.2d 563, 565 (Ga. Ct. App. 2014)). And if a provision of an insurance contract is ambiguous, the contract "will be construed against the party preparing it and in favor of coverage." Alewine v. Horace Mann Ins., 398 S.E.2d 756, 757 (Ga. Ct. App. 1990) (citation omitted). Georgia courts define "ambiguity" as "duplicity, indistinctness, an uncertainty of meaning or expression." Tarbutton v. Duggan, 163 S.E. 298, 298 (Ga. Ct. App. 1932); see also Lee, 808 S.E.2d at 732-33. If the language of the contract is "plain, unambiguous, and capable of only one reasonable interpretation," the language "must be afforded its literal meaning and plain ordinary words given their

usual significance." <u>Longstreet v. Decker</u>, 717 S.E.2d 513, 516 (Ga. Ct. App. 2011) (internal quotation marks and citation omitted). In other words, if the contract's terms are plain and unambiguous, the Court will apply those terms as written.

## II.  Interpretation of Plaintiff's Insurance Policy

Defendant Heritage spends a great deal of effort marshalling all of the facts regarding where, and for how long, Plaintiff resided at various locations. It does so in order to show whether or not Plaintiff was residing on the premises and whether or not the premises were vacant. Ultimately—and barely—the Court finds such facts are in dispute. Not so with regard to the issue of concealment or fraud.

Plaintiff argues that the policy's concealment or fraud provision contains an ambiguity. Dkt. No. 34 at 22. Specifically, Plaintiff contends this section contains a double negative, which renders it ambiguous. <u>Id.</u> Plaintiff is wrong. His error stems from the fact that he incorrectly quotes the provision. Plaintiff's version of the contract states: "We provide *no* coverage to no 'insureds' under this policy" if the insured makes false statements or misrepresentations. <u>Id.</u> at 21 (emphasis added). The contract's actual language states: "We provide coverage to no 'insureds' under this policy." Dkt. No. 7-4 at 23.

Absent Plaintiff's mistaken inclusion of the double negative, the actual provision's terms are plain and unambiguous. The policy

14

precludes coverage if the insured commits fraud or provides false information. Id. at 32. Reading this provision as a lay person would, it is clear that Heritage could deny coverage entirely if Plaintiff intentionally concealed or misrepresented any material fact or circumstance; engaged in fraudulent conduct; or made false statements regarding his insurance. Id. Because the concealment or fraud provision is "capable of only one reasonable interpretation," the Court will apply the terms of the provision as written. Longstreet, 717 S.E.2d at 516. The Court declines to insert an additional "no" into the actual language of the contract.

## III. The Undisputed Facts Show that Plaintiff Breached the Concealment or Fraud Provision.

"Under a misrepresentation clause, a willful and intentional misrepresentation of material facts made for the purpose of defrauding the insurer will void the contract." Perry v. State Farm Fire & Casualty Co., 734 F.2d 1441, 1443 (11th Cir. 1984) (citing Am. Alliance Ins. Co. v. Pyle, 8 S.E.2d 154, 160 (Ga. Ct. App. 1940)). "A misrepresentation is material if it might affect the insurer's action in respect to settlement or adjustment of the claim of the insured." Id. (alterations adopted) (internal quotation marks omitted). The insurer, however, "need not actually rely on the representation or suffer any prejudice therefrom." Id. (citing Pittman v. Am. Mut. Fire Ins. Co., 199 S.E.2d 893, 894 (Ga. Ct. App. 1973)). "Whether a misrepresentation is material is

15

a jury question, unless the evidence excludes every reasonable inference except that there was or was not a material misrepresentation." Id. at 1444 (citing United Family Life Ins. Co. v. Shirley, 248 S.E.2d 635, 636 (Ga. 1978)).

In this case, the undisputed evidence establishes that Plaintiff made material misrepresentations about the two seven-foot televisions. In December 2021, Plaintiff told Heritage that he owned the televisions and that they were both in the house at the time of the vandalism incident. Dkt. No. 25-4 at 138:23-25, 139:1-16. Specifically, Plaintiff stated under oath that one television was in the living room and the other was in the master bedroom. Id. Plaintiff's story changed at his August 25, 2023 sworn deposition. When deposed, Plaintiff admitted that he had never seen the televisions in his house. Dkt. No. 25-5 at 44:24-25, 45:1. He also said that he "never physically put [his] hands on those TVs" and that he "never physically saw the TVs in [his] home." Dkt. No. 25-5 at 32:8-9, 34:19-20. Moreover, Plaintiff admitted that it was actually Avery who owned the televisions. See id. at 34:19-25 (referring to the televisions as Avery's), 45:1-2 (same), 48:22-23 ("[E]verything in [the list of stolen items] is mine except right here where it say [sic] these 85-inch TVs.").

Plaintiff also made misstatements about the police report and Avery's statements to the police. He told Heritage in his deposition that the initial police report listed the televisions

16

as stolen. Id. at 30:13–15, 31:16–19. Heritage was able to obtain the initial police report. It appears in the record, dkt. no. 25-11, and it says nothing about televisions. Plaintiff never uncovered or produced a competing version of the initial report nor provided any proof that it was altered. He told Heritage that Avery reported the televisions as stolen when the police searched his house on May 26, 2021. Dkt. No. 25-5 30:13–15. She did not. Dkt. Nos. 25-11, 25-7 ¶¶ 28, 31. Plaintiff may personally attempt to dispute the evidence by stating that "it was told to [him] in the police report they were no longer there," dkt. no. 25-5 at 31:17–19, but this alone in no way creates a genuine dispute of fact. It is, all at the same time, a fine point, an important point, and—perhaps—a self-evident point, that a party does not create a factual dispute by testifying that a document tells him something that it actually does not say. Saying a dollar bill tells you it's a ten does not change its value. See Anderson, 477 U.S. at 248 ("[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." (internal quotation marks and citation omitted)).

Plaintiff's misrepresentations were material. The ownership of the televisions and whether they were stolen from the house are, without question, issues that "might affect the insurer's

action in respect to settlement or adjustment of the claim of the
insured." Perry, 734 F.2d at 1443. Plaintiff's policy
differentiates between coverage for personal property owned by the
insured and property owned by non-insureds. Dkt. No. 7-4 at 9.
Therefore, whether Plaintiff or, instead, Avery owned the
televisions affects Heritage's coverage of the property. Moreover,
the location of the televisions affects Heritage's coverage. Id.
If Avery owned the televisions—as Plaintiff admitted finally in
his deposition—then Heritage would only cover their loss if the
televisions were "on the part of the residence premises occupied
by an insured." Id. If Avery's televisions were not located in the
house, Heritage would not be obligated to cover them at all. Id.
If the televisions belonged to Plaintiff, Heritage would cover
them regardless of their location. Id. Plaintiff's
misrepresentations are material. His first version—the one that
formed the basis of his claim and lawsuit—if true, would justify
coverage. The final version, rendered during cross examination
during discovery, does not. At first, Plaintiff claimed that he
owned the televisions and that they were stolen directly from the
Atlanta house. Dkt. No. 25-4 at 138:23-25, 139:1-16. The policy
would clearly cover this type of loss. He later admitted under
oath: Avery owned the televisions and that he had never seen them
in the house. Dkt. No. 25-5 at 34:19-25, 44:24-25, 45:1-2, 48:22-
23. For her part, Avery testified that she owned the televisions,

18

never brought them to Plaintiff's house, and never saw them in Plaintiff's house. Dkt. No. 25-7 ¶¶ 28, 31.

Essentially, Plaintiff has admitted all this in his response to Heritage's statement of material facts. In its statement, Heritage stated: "The televisions, in particular, belonged not to Plaintiff, but his then-girlfriend, Ms. Avery, and at all times were kept in her midtown Atlanta condo unit." Dkt. No. 25-1 ¶ 30. In his response, Plaintiff said: "Ms. Avery has reported to the police department that the televisions were stolen. Also the policy covered the property of others that was at the residence." Dkt. No. 34-2 ¶ 30. Again, Plaintiff has provided no evidence that Avery reported stolen televisions to the police. Nor is there salvation in typing the words "[a]lso the policy covered the property of others that was at the residence." That is Defendant's point. Even Plaintiff now admits the televisions were not at the residence. Resultingly, Plaintiff admits that Avery owned the televisions and that they were never in his house. Because an uninsured owned the televisions and the televisions were not located in Plaintiff's house, the policy would not cover their so-called theft. And so, by lying about the ownership and location of the televisions, Plaintiff made material misrepresentations.

Thirdly, although overkill, whether the televisions were stolen or not obviously affects the amount of money that Heritage might be required to pay for coverage.

Plaintiff originally told Heritage, under oath, that he learned of the televisions' theft from the May 26, 2021 police report. Dkt. No. 25-5 at 30:10-11 ("[B]oth of those TVs was [sic] filed as items missing from my home."), 30:14-15 ("[T]he police report say [sic] that those TVs were missing out of the home."). The undisputed evidence shows that no such report exists. The May 26, 2021 police report does not mention the theft of any property. Dkt. No. 25-11. Avery did not report any stolen property to the police. Id. The first and only mention of stolen televisions came from a missing property list written and submitted to the police by Plaintiff himself. Dkt. No. 25-13. But again, during the course of this case, Plaintiff changed his story and has now admitted that "at all times [the TVs] were kept in [Avery's] midtown Atlanta condo." Dkt. No. 25-1 ¶ 30; Dkt. No. 34-2 ¶ 30. The televisions could not have been stolen from Plaintiff's house if they were never in his house.

In short, Plaintiff materially misrepresented the theft, ownership, and location of the televisions. While the materiality of a misrepresentation is typically a jury question, the evidence in this case "excludes every reasonable inference except" that there were material misrepresentations. Perry, 734 F.2d at 1444. Given this, a jury need not decide materiality. See, e.g., Liberty Corporate Cap., Ltd. v. Bhanu Mgmt., 161 F. Supp. 3d 1307, 1318-21 (S.D. Ga. 2015) (finding that the undisputed evidence

established "that [the claimant's] misrepresentations of the extent of its losses were material to the adjustment of the claim"); Assurance Co. of Am. v. Defoor Station, LLC, No. 1:09-CV-3198, 2011 WL 5598900, at *5 (N.D. Ga. Nov. 15, 2011) (finding that the undisputed evidence established material misrepresentations and that the claimant's unsupported statements contradicting the evidence did not create a material fact issue for summary judgment); Perspolis, Inc. v. Federated Mut. Ins. Co., No. 1:03-CV-2456, 2006 WL 826469, at *2 (N.D. Ga. Mar. 28, 2006) (finding that an insurance company "properly invoked the 'concealment, misrepresentation or fraud' provision" because the evidence established that the plaintiff claimant "intentionally misrepresented a material fact").

Applying the terms of the concealment or fraud provision in Plaintiff's policy, Plaintiff's misrepresentations were willful, intentional, and intended to defraud Heritage. "An intent to defraud can be inferred when the misrepresentation is made willfully and intentionally." Fiveash v. Allstate Ins. Co., 603 F. App'x 773, 775 (11th Cir. 2015). In other words, "[t]here must be a willful intent to defraud rather than an innocent mistake." Id. at 776 (citing Watertown Fire Ins. Co. v. Grehan, 74 Ga. 642, 656-57 (1885)). The record reflects that Plaintiff acted willfully and intentionally in misrepresenting the theft, ownership, and location of the televisions. Plaintiff alone submitted the missing

property list that first mentioned the televisions. Plaintiff alone told Heritage that he owned the televisions and told them exactly where they were in his house. When Heritage investigated Plaintiff's claim, he did not retract these statements or tell Heritage that he was mistaken. He entirely changed his story. Instead of Plaintiff owning the televisions, Avery owned them. Instead of knowing the exact locations of the televisions, he had never seen them before. Instead of Plaintiff reporting the theft of the televisions, Avery reported the theft in the May 26, 2021 police report.

Plaintiff even had an opportunity to correct his testimony from the December 2, 2021 examination under oath. Dkt. No. 25-5 at 15–18. Following this first examination, Plaintiff received an errata sheet. Id. at 16:14–25. At his deposition, Plaintiff agreed that he "had an opportunity to read [his testimony from the December 2, 2021 examination under oath] all in as much detail as [he] wanted to," but "ended up not making any changes to [his] testimony." Id. at 17:11–21. No evidence was submitted showing the misrepresentations were innocent or accidental.

Importantly, Plaintiff told two mutually exclusive stories. As both versions of the same event cannot be true, Plaintiff either told a falsehood in his first story, told a falsehood in his

second, or did so in both.[5] The result is the same: Plaintiff violated the policy's concealment or fraud provision. The undisputed evidence shows that Plaintiff intentionally misrepresented material facts, engaged in fraudulent conduct, and made false statements relating to his insurance. See Dkt. No. 7-4 at 23. Because he breached this provision, Heritage could deny coverage of Plaintiff's claim in its entirety. Id.

Although Heritage has put forth arguments to support additional examples of fraudulent misrepresentations plaguing Plaintiff's claim (e.g., the request for $15,200 of living expenses for which there is no documentation), it is unnecessary to resolve the list. Plaintiff's misrepresentations about the seven-foot televisions are alone sufficient to invalidate his entire claim.

---

[5] This conclusion derives from De Morgan's laws for logical propositions. See Morton L. Schagrin & G.E. Hughes, *Formal Logic*, Encyclopedia Britannica (last updated May 9, 2024), https://www.britannica.com/topic/formal-logic. "The negation of the conjunction of two propositions ... is equivalent to the disjunction of the negations of those propositions." Andy Hayes & Vincent Wu, *De Morgan's Laws*, Brilliant, https://brilliant.org/wiki/de-morgans-laws/. This means that if two propositions cannot both be true, then either one proposition is false or both are false. Id. In the classic example, if two men both claim to be Jesus, either one man is wrong or both are wrong, but both cannot be right. The same principle applies here. Plaintiff, under oath, provided two representations to Heritage: (1) he owned the televisions and knew their locations in his house, and (2) he did not own the televisions and never saw them in his house. Both propositions cannot be true. Applying De Morgan's law, then, either one of Plaintiff's representations is false or both are false. Put briefly, Plaintiff misrepresented the facts supporting his claim for the televisions.

The law cannot spot Plaintiff one misrepresentation while allowing the remainder of his $158,009 claim to survive. His material misrepresentations about the televisions preclude coverage. Heritage is, therefore, entitled to summary judgment on Plaintiff's claim for policy proceeds and attorney's fees.

## IV.   Plaintiff Cannot Satisfy O.C.G.A. § 33-4-6's Requirements.

Because Defendant is entitled to prevail on the coverage issue, it is, therefore, entitled to prevail on any claim that it denied coverage in bad faith. Even if there were a dispute of material fact on the coverage claim, summary judgment is warranted for Heritage on the bad faith claim, because Heritage had non-frivolous grounds for denying the claim.

As the Eleventh Circuit recently explained, "O.C.G.A. § 33-4-6 is not a strict liability statute. An insurance company that fails to make a payment on a covered claim within sixty days of a demand faces a penalty only if its nonpayment was motivated by bad faith." Turner v. CMFG Life Ins. Co., No. 23-11387, 2023 WL 5527748, at *2 (11th Cir. Aug. 28, 2023) (citing Lavoi Corp. v. Nat'l Fire Ins. of Hartford, 666 S.E.2d 387, 391 (Ga. Ct. App. 2008)). "[B]ad faith . . . is defined as any frivolous and unfounded refusal in law or in fact to comply with the demand of the policyholder to pay according to the terms of the policy." Ga. Farm Bureau Mut. Ins. Co. v. Williams, 597 S.E.2d 430, 432 (Ga. Ct. App. 2004) (internal quotation marks omitted) (quoting Fortson

v. Cotton States Mut. Ins. Co., 308 S.E.2d 382, 384 (Ga. Ct. App. 1983)).

O.C.G.A. § 33-4-6 imposes a penalty. Turner, 2023 WL 5527748, at *2. Penalties and forfeitures are not favored under Georgia law. S. Gen. Ins. Co. v. Kent, 370 S.E.2d 663, 665 (Ga. Ct. App. 1988) (citation omitted). For that reason, the right to recover under O.C.G.A. § 33-4-6 "must be clearly shown" and the statute's requirements "are strictly construed." Turner, 2023 WL 5527748, at *2 (internal quotation marks and citations omitted). Bad faith penalties are not authorized if "the insurance company has any reasonable ground to contest the claim" and if "there is a disputed question of fact" as to the validity of the claim. Allstate Ins. Co. v. Smith, 597 S.E.2d 500, 502 (Ga. Ct. App. 2004) (internal quotation marks and citation omitted).

As the insured party, Plaintiff bears the burden of proving Heritage's bad faith. Ga. Farm Bureau Mut. Ins. Co., 597 S.E.2d at 432. To avoid summary judgment, Plaintiff must provide evidence of Heritage's bad faith capable of putting the issue into genuine dispute. He has not.

Heritage has brought forth considerable evidence calling into question material issues of coverage, including vacancy, residency, and loss of use. Significantly, Heritage was able to show that Plaintiff materially misrepresented his claim for insurance coverage for the two televisions that were not in his

home and not owned by him and not subjected to theft as he originally claimed. Plaintiff provided ample reason for Heritage to contest his claim.

Beginning with Plaintiff's residency, when he applied for his policy in March 2021, he said that the Atlanta house was his primary residence. Dkt. No. 25-8 at 1. When Plaintiff filed to run for mayor in August 2021, however, he said that he had been a resident of Glynn County for over a year. Dkt. No. 25-6. Plaintiff admitted his water bills for March, April, and May of 2021 show a lack of water usage for those months at the Atlanta house. Dkt. No. 25-5 at 90:16-25, 91:1-3. Given these facts, Heritage's refusal to provide coverage because it concluded the house had been vacant was not "frivolous and unfounded." See Ga. Farm Bureau Mut. Ins. Co., 597 S.E.2d at 432.

Heritage also did not act in bad faith when it denied Plaintiff's claim because he failed to provide any evidence supporting his loss-of-use claim. Plaintiff claimed that he lived in hotels from May to December of 2021, incurring over $15,000 in expenses. Dkt. No. 25-4 at 172:5-25, 173:1-20; Dkt. No. 7-3 at 1. Yet, Plaintiff did not provide a single receipt or any proof of these expenses. When pressed further about this at his deposition, Plaintiff could not even name a location at which he temporarily lived. Dkt. No. 25-5 at 99:8-12. Plaintiff could not explain why he had to live in hotels and other locations for months when he

supposedly owned multiple residences. Dkt. No. 25-4 at 171–74. Heritage did not act in bad faith and had a reasonable ground to refuse coverage for loss-of-use.

Finally, Heritage did not act in bad faith by denying Plaintiff's entire claim because of his material misrepresentations. As the Court explained above, Plaintiff provided materially false statements about the theft, ownership, and location of the two seven-foot televisions. Heritage did not act frivolously or unreasonably by invoking the concealment or fraud provision in Plaintiff's policy.

Looking at the totality of the circumstances underlying Heritage's denial of coverage, Plaintiff has not clearly shown a genuine dispute of material fact that Heritage violated O.C.G.A. § 33-4-6. Therefore, Heritage's motion for summary judgment as to Plaintiff's § 33-4-6 claim is **GRANTED**.

**CONCLUSION**

For these reasons, Defendant Heritage's motion for summary judgment, dkt. no. 25, is **GRANTED**. Heritage's motion to strike Plaintiff's supplemental brief, dkt. no. 38, is thus **DENIED as moot**. There being no claims remaining in this action, the Clerk is **DIRECTED** to close this case.

**SO ORDERED** this 29th day of August, 2024.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA